**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

BD MEDICAL SUPPLIES LLC,

    **Plaintiff,**

 **v.**              Case No. 21-1226-DDC

BLUESTEM MANAGEMENT
ADVISORS, LLC, and THOMAS D.
JOHNSON,

    **Defendants.**

_____

**MEMORANDUM AND ORDER**

In December 2020, plaintiff BD Medical Supplies LLC—looking to capitalize on the volatile personal protective equipment market during the COVID-19 pandemic—ordered nitrile gloves from defendant Bluestem Management Advisors, LLC.  Plaintiff ordered 2.1 million boxes of gloves, but only received a small fraction of those boxes, months later than expected. Plaintiff sued Bluestem and Thomas D. Johnson, Bluestem's president, agent, and sole member. Plaintiff alleges that defendants breached the parties' contract and fraudulently induced plaintiff to order gloves by misrepresenting Bluestem's manufacturing connections and capabilities.

Defendants now move for summary judgment against both claims.  Doc. 52.  To defeat plaintiff's breach of contract claim, defendants blame plaintiff's own failure to perform. Defendants also invoke the affirmative defenses of force majeure and impracticability, blaming COVID-19 related manufacturing delays and a manufacturer's misconduct for Bluestem's failure to deliver the gloves.  To defeat plaintiff's fraud claim, defendants argue that they did not tell plaintiff anything demonstrably false—they merely used corporate puffery.

For reasons explained below, the court denies defendants' motion.

# I.    Facts[1]

The parties spent many months negotiating a potential order of nitrile gloves.  On June 12, 2020, Johnson told plaintiff in an email, "We have 26 facilities producing for us in SE Asia, strategically."  Doc. 54-4 at 3 (Pl.'s Ex. 4).  In a June 16, 2020, email, Johnson mentioned "our 16 factory consortium of secured production[.]"  *Id.* at 4 (Pl.'s Ex. 4).  On July 30, 2020, Johnson told plaintiff, "We have 21 factories in our glove consortium with the balance of below market pricing[.]"  Doc. 54-10 at 1 (Pl.'s Ex. 10).

On December 11, 2020, plaintiff signed a Sales & Purchase Agreement (SPA), dated December 9, 2020, with defendant Bluestem.  Doc. 51 at 2 (Pretrial Order ¶ 2.a.4.).  In the SPA, plaintiff agreed to purchase 2.1 million boxes of nitrile gloves from Bluestem.  *Id.*  The agreement broke the overall order into ten installments of 210,000 boxes over a 12-month period continuing through December 31, 2021.  *Id.*  The SPA also included a delivery schedule that set the first shipment date on a to-be-determined date in January 2021.  *Id.* (Pretrial Order ¶ 2.a.5.).

## A.  Relevant SPA Provisions

Because this is a breach of contract case, the court recites the relevant provisions of the contract.  Section 2.3 of the SPA, titled Payment and Shipment Schedule, references the delivery schedule and states:

> (b)  Each shipment requires that the Seller provide an SGS or equivalent inspection and Bill of lading[2] for the specific lot shipping to Buyer[.]  Buyer and Seller will repeat the process detailed in Section 2.2(b) until total order is filled.

---

[1]    In their Reply, defendants ask the court to strike a declaration attached to plaintiff's Response—specifically, the Boé Declaration.  Doc. 60 at 18–19 (asking the court to strike Doc. 54-2 (Decl. of Joel Boé)).  The court does not refer to or rely on the Boé declaration, so defendants' request is moot.

[2]    A bill of lading is a document acknowledging receipt of cargo for shipment.  Doc. 51 at 4 (Pretrial Order ¶ 2.a.9.).  A party cannot issue a bill of lading for manufactured goods until the manufacturer releases the goods to a carrier for shipment.  *Id.*

. . . .

(c) This schedule is referring to the shipment day, the actual delivery date may be earlier and will inform the Buyer about the shipment changes.  The balance of shipment payment, thirty-five percent (35%) of shipment total will be paid when Buyer is provided SGS or equivalent inspection report and, Bill of Lading within 21 days of deposit release from Escrow.

*Id.* at 2–3 (Pretrial Order ¶ 2.a.6.).

Section 8.1, titled Liability and Breach of Contract and Liquidated Damages, establishes the processes used in the event of cancellation or delay:

In the event that the seller cannot deliver the product and it is not the seller['s] fault, the seller will inform with a notice in writing to the buyer prior to the delivery schedule.   In the event that the seller has problems in any manufacturing process which will lead to delay of delivery, the seller shall inform in writing the buyer with the approximated time period to deliver the product in a reasonable time.  If no documentation has been provided to Buyer within twenty-one (21) days as defined in Section 2.3(c), then Buyer can request in writing a refund of deposited funds and full release from Escrow of all Buyer funds to be returned within three (3) business days with no penalty to either party.

*Id.* at 3 (Pretrial Order ¶ 2.a.7.).

And Section 7.2, titled Force Majeure, provides, "Neither party shall be in default of any obligation under this Agreement due to any delay or failure to perform such obligation if such delay or failure arises out of causes beyond such Party's control."  *Id.* (Pretrial Order ¶ 2.a.8.).

## B.  Plaintiff's Order

Back on December 7, 2020, before the parties signed the SPA, plaintiff deposited the full purchase price of $1,785,000 into the parties' escrow account for 210,000 boxes of nitrile gloves. *Id.* at 4 (Pretrial Order ¶ 2.a.10.).  The same day, the parties directed the escrow agent to release 65% of the funds ($1,160,250) from the account.  *Id.* (Pretrial Order ¶ 2.a.11.).  Then, on December 16, 2020, defendant Bluestem provided plaintiff with information about the first expected shipment.  *Id.* (Pretrial Order ¶ 2.a.12.).  Defendant Bluestem stated that two separate

manufacturers, SkyMed and BestSafe, would handle plaintiff's order and ship the first installment by the end of January 2021.  *Id.*

On December 30, 2020, defendant Bluestem sent plaintiff an unsigned statement on the letterhead of Sufficiency Economy City Co. Ltd.,[3] the manufacturer of SkyMed gloves, stating that manufacturing on plaintiff's order had begun.  *Id.* (Pretrial Order ¶ 2.a.13.).  On January 3, 2021, plaintiff emailed defendant Johnson.  *Id.*  (Pretrial Order ¶ 2.a.14.).  Plaintiff noted that the SkyMed letter wasn't signed and told defendant Johnson that the following day plaintiff's representatives were "required to give a written, documented update to our investors as SGS and BOL were due . . . on December 29 per our agreement.  They have the right to exercise the 21 day backstop in our agreement."  *Id.*  On January 7, 2021, defendant Johnson sent plaintiff a signed copy of the December 30 SkyMed letter.  *Id.* (Pretrial Order ¶ 2.a.15.).

### C.  Problems Arise

On January 19, 2021, defendant Johnson received a letter from Sufficiency Economy City informing him of production issues causing delays.  *Id.* at 4–5 (Pretrial Order ¶ 2.a.16.). The letter stated,

> We, Sufficiency Economy City Co., Ltd. Would like to show our true intention of delivering every single product to our valuable customers.  Unfortunately, we have faced some unexpected situations with our OEM product.  We realized that some of the OEM products did not reach the specifications required.
>
> In addition, currently there is a lock down in some areas of Thailand due to the epidemic of COVID-19 which affects our production line.  We have informed all of our customers that we are doing our best to have our own production line. The early stages of our SKYMED city will be completed by the end of March 2021.  We therefore, would like to thank you for your trust and would like to assure you that we, SKYMED will solve this gloves shortage situation including the lack of medical supplies globally.

---

[3]     Sufficiency Economy City Co. Ltd. manufactured SkyMed gloves.  Doc. 51 at 4 (Pretrial Order ¶ 2.a.13.).  For simplicity, this Order refers to the entity as "SkyMed" when possible.

> We will do our best to provide you the best products possible to fulfill your requirements.

*Id.*  Then, on January 22, 2021, defendant Johnson emailed plaintiff stating that plaintiff had "received everything requested" in the SPA other than the bill of lading and that every deliverable under the contract had been provided to plaintiff.  *Id.* at 5 (Pretrial Order ¶ 2.a.17.).

On February 1, 2021, plaintiff notified defendants that it was exercising what it claimed was a refund right under the SPA.  *Id.* (Pretrial Order ¶ 2.a.18.).  That same day, defendants forwarded plaintiff a letter on Sufficiency Economy City letterhead dated January 31, 2021.  *Id.* (Pretrial Order ¶ 2.a.19.).  The form letter stated,

> We, Sufficiency Economy City Co., Ltd. would like to show our true intention of delivery every single product to our valuable customers.  Unfortunately, we have faced some unexpected situations.
>
> In addition, currently there is a lock down in some areas of Thailand due to the epidemic of COVID-19 which affects our production line.  We therefore, would like to thank you for your trust and would like to assure you that we, SKYMED will solve this gloves shortage situation including the lack of medical supplies globally.
>
> We will do our best to provide you the best possible products to fulfill your requirements.

*Id.* at 5–6 (Pretrial Order ¶ 2.a.19).  On March 30, 2021, defendant Bluestem demanded a refund from SkyMed.  *Id.* at 6 (Pretrial Order ¶ 2.a.20.).  On April 22, 2021, defendant Bluestem released $291,000 from the escrow account to plaintiff.  *Id.* (Pretrial Order ¶ 2.a.21.).  On April 25, 2021, Bluestem also repeated its refund demand to SkyMed.  *Id.* (Pretrial Order ¶ 2.a.22.).

In May 2021, plaintiff received the first shipment of gloves.  *Id.* (Pretrial Order ¶ 2.a.23.).  Plaintiff inspected, verified, and accepted the shipment of 30,000 boxes.  *Id.*  Then, in July 2021, defendant Bluestem notified plaintiff that Bluestem had "a container at the Port of Los Angeles that contain[ed] the following nitrile gloves:  9510 boxes of Small, 2280 boxes of Large and

19,710 boxes of XL." *Id.* (Pretrial Order ¶ 2.a.24.).  Defendant Bluestem attached a bill of lading, inspection report, and factory invoice showing that the products had shipped.  *Id.*  Plaintiff also accepted these boxes of gloves.  *Id.*

On August 4, 2021, defendant Bluestem sent plaintiff an arrival notice for a container.  *Id.* (Pretrial Order ¶ 2.a.25.).  On August 16, 2021, plaintiff picked up the container and discovered that it contained 28,100 boxes of medium gloves and 3,900 boxes of large gloves.  *Id.* (Pretrial Order ¶ 2.a.26.).  Again, plaintiff accepted the shipment.  *Id.*

Defendant Johnson later reported SkyMed to the Department of Homeland Security's investigative arm and the United States Secret Service's Bangkok Resident Office.  *Id.* (Pretrial Order ¶ 2.a.27.).  Thai authorities arrested SkyMed's CEO in November 2021 and charged him with public fraud and distributing false information.  Doc. 53-3 at 2–3 (Defs.' Ex. C).

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).  Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Finally, federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.    Breach of Contract

The court begins its analysis with defendants' Motion for Summary Judgment against plaintiff's breach of contract claim. Defendants argue that they deserve summary judgment because (A) plaintiff itself failed to perform and (B) though Bluestem never delivered plaintiff's gloves, affirmative defenses excuse Bluestem's non-performance. Though defendants abandoned the first argument—plaintiff's alleged non-performance.[4] Nonetheless, the court examines each theory, in turn, below.

### A.  Whether Plaintiff Failed to Perform

Defendants argue that the court should grant them summary judgment against plaintiff's breach of contract claim because plaintiff cannot meet an element of its breach of contract claim. In Kansas,[5] a prima facie case for breach of contract has five elements: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the

---

[4]      *See generally* Doc. 60. There, defendants never even mention plaintiff's alleged failure to perform. Based on defendants' failure to address this argument in the Reply, the court can consider it abandoned. *See In re FCC 11-161*, 753 F.3d 1015, 1100–01 (10th Cir. 2014) (rejecting petitioners' argument because their reply brief was silent on an issue and made no attempt to rebut the respondents' argument); *see also Cayetano-Castillo v. Lynch*, 630 F. App'x 788, 794 (10th Cir. 2015) (holding that an appellant, who does not respond to an argument in its reply brief, "'waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the appellee'" because the court is not "required to do his work for him and dissect [the appellee's] plausible argument") (quoting *Hardy v. City Optical, Inc.*, 39 F.3d 765, 771 (7th Cir. 1994)).

[5]      The parties have stipulated that Kansas law governs the claims and defenses in this case. Doc. 51 at 2 (Pretrial Order ¶ 1.d.). The SPA also names Kansas as the applicable law and jurisdiction for the contract. Doc. 54-24 at 7 (SPA ¶ 7.8).

plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (citations omitted).  Defendants' argument focuses on element three.  Defendants argue that plaintiff failed to fully perform its own obligations because plaintiff never paid in full for the gloves, as required by the SPA.  Doc. 53 at 13–14.  So, defendants argue, plaintiff cannot bring a breach of contract claim.  Defendants are wrong.

Defendants have failed to adduce evidence that they met the SPA's conditions necessary to trigger plaintiff's duty to pay in full.  Section 2.3 of the SPA covers payment.  Doc. 54-24 at 3 (SPA ¶ 2.3).  Section 2.3 says, "The balance of shipment payment, thirty-five percent (35%) of shipment total will be paid when Buyer is provided SGS or equivalent inspection report, and Bill of Lading within 21 days of deposit release from Escrow."[6]  *Id.* (SPA ¶ 2.3(c)).  Defendants fail to adduce any evidence—much less undisputed evidence— that they provided these documents to plaintiff.  Indeed, the summary judgment record contains no evidence that Bluestem fulfilled even one month's worth of plaintiff's glove order.  And at least one document requires completed manufacturing; a "Bill of Lading for manufactured goods cannot be issued before the manufacturer has released the goods to a carrier for shipment."  Doc. 51 at 4 (Pretrial Order ¶ 2.a.9.).  Without a completed order, a corresponding inspection report, and a Bill of Lading, defendants cannot trigger plaintiff's duty to pay in full.  Defendants present no evidence of any

---

[6]     Defendants acknowledge that Section 2.3(c)'s phrase "within 21 days of deposit release from Escrow" is ambiguous.  Doc. 53 at 14–15 ("Section 8.1 [is] silent as to what 'deposit release from [E]scrow' means[.]").  The deposit release from escrow could have occurred when the parties released the initial 65% of the deposited payment price on December 7, 2022.  Doc. 51 at 4 (Pretrial Order ¶ 2.a.11.).  Or the contract could mean the release of 100% of the funds from escrow.  But, as explained below, the court need not resolve this issue because—no matter which interpretation is correct—plaintiff did not receive its shipment of gloves or any notice by the end of January 2021.

of these things, so they cannot defeat plaintiff's breach of contract claim as a matter of law by blaming plaintiff's failure to perform.[7]

### B. Excusing Bluestem's Non-Performance

As explained above, the parties do not dispute that plaintiff never received the gloves it ordered—Bluestem failed to perform.  Defendants' summary judgment motion seeks to excuse Bluestem's non-performance for two reasons:  the SPA's force majeure clause and Kan. Stat. Ann. § 84-2-615.  As explained below, neither one excuses Bluestem's failure to perform.

### 1. Force Majeure

Defendants argue that Bluestem did not breach the SPA as a matter of law because the SPA contains a broad force majeure provision that excuses Bluestem's delay and non-performance.  The force majeure provision provides, "Neither party shall be in default of any obligation under this Agreement due to any delay or failure to perform such obligation if such delay or failure arises out of causes beyond such Party's control." *Id.* at 3 (Pretrial Order ¶ 2.a.8.).  Defendants argue two events—both beyond Bluestem's control, they say—caused Bluestem's delay and failure to perform:  a resurgence of COVID-19 in Thailand and SkyMed's refusal to refund plaintiff's deposit money.  Doc. 53 at 17.  Defendants ask the court to determine that the resurgence of COVID-19 in Thailand and SkyMed's unscrupulous behavior were beyond Bluestem's control, apply the force majeure provision, and call it a day. *See id.* at 16–18.

Not so fast, responds plaintiff.  Plaintiff argues that defendants cannot use the force majeure clause to escape because Bluestem had complete control over its choice of manufacturer

---

[7]    Defendants anticipated that plaintiff would try to excuse plaintiff's non-performance by arguing that Section 8.1 of the SPA allowed plaintiff to cancel the contract and demand a refund.  Doc. 53 at 14–16.  But, as explained above, the court concludes that defendants have failed to adduce evidence of plaintiff's non-performance because Bluestem never met the conditions necessary to trigger plaintiff's duty to pay in full.  So, the court need not address defendants' arguments about Section 8.1.

and must bear responsibility for picking poorly.  Doc. 54 at 21.  Plaintiff also cites SPA § 5.1—where the parties promised that their subcontractors and suppliers would comply with all applicable laws—to argue that Bluestem assumed the risk of its manufacturers' malfeasance.  *Id.*; *see also* Doc. 54-24 at 4–5 (SPA § 5.1).  And plaintiff argues that the court cannot consider the force majeure clause in isolation because SPA § 8.1 applies, which requires notice and a refund, and, according to plaintiff, it did not receive either.  Plaintiff's right.

### a.  SPA § 7.2

First, a fact issue precludes summary judgment for defendants.  To prevail on summary judgment based on the force majeure clause, defendants must show that Bluestem's failure to deliver the gloves arose out of a cause beyond Bluestem's control.  As already referenced, defendants cite two forces allegedly outside of Bluestem's control:  COVID-19's resurgence in Thailand and SkyMed's misbehavior.  But both of those forces relate solely to SkyMed.  As plaintiff correctly points out, the SPA didn't require Bluestem to contract with SkyMed; Bluestem chose SkyMed.  *See generally* Doc. 54-24 (SPA).  Construing the facts in the light most favorable to plaintiff, a reasonable factfinder could attribute Bluestem's non-performance entirely to its choice of manufacturer—a force well within Bluestem's control.  Indeed, Bluestem never had fulfilled a complete nitrile glove order for any customer using SkyMed gloves.  Doc. 54-1 at 15 (Johnson Dep. 64:1–21).  Also, a reasonable factfinder reasonably could conclude that Bluestem should have looked to manufacturers other than SkyMed for gloves once Bluestem realized SkyMed could not deliver.  Put differently, defendants blame SkyMed but, at summary judgment, that is not enough—a reasonable factfinder could place the blame on defendants.

**b.  SPA § 8.1.**

Plaintiff argues that Bluestem failed to comply with SPA § 8.1, so it cannot take advantage of § 7.2.  Section 8.1 covers liability, breach of contract, and liquidated damages.  It provides,

> In the event that the seller cannot deliver the product and it is not the seller['s] fault, the seller will inform with a notice in writing to the buyer prior to the delivery schedule.  In the event that the seller has problems in any manufacturing process which will lead to delay of delivery, the seller shall inform in writing the buyer with the approximated time period to deliver the product in a reasonable time.  If no documentation has been provided to buyer within twenty-one (21) days as defined in Section 2.3(c), then Buyer can request in writing a refund of deposited funds and full release form Escrow of all Buyer funds to be returned within three (3) business days with no penalty to either party.

Doc. 51 at 3 (Pretrial Order ¶ 2.a.7.).  As explained below, even if SPA § 7.2 applied, defendants have failed to adduce evidence that they informed plaintiff as required by SPA § 8.1.

As a threshold matter, defendants seem to suggest that the court should apply the force majeure clause without considering § 8.1.  *See* Doc. 53 at 16–18.  But that interpretation would interpret the contract unreasonably.  When interpreting contracts, Kansas courts "do not isolate one particular portion of a contract but rather construe and consider the entire document." *Krigel & Krigel, P.C. v. Shank & Heinemann, LLC*, 528 P.3d 1030, 1036 (Kan. Ct. App. 2023).  Section 8.1 specifically contemplates a scenario where "the seller cannot deliver the product and it is not the seller['s] fault"—which is exactly what happened here.  Section 8.1 also specifically contemplates a scenario in which "the seller has problems in any manufacturing process which lead to delay of delivery"—which is exactly what happened here, at least at first.  So, § 8.1 applies here.

Turning to the heart of the issue, defendants argue that Bluestem informed plaintiff of delays in writing, so Bluestem met the requirements of § 8.1.  Doc. 53 at 14.  Defendants cite two undisputed facts trying to establish the requisite notice to plaintiff:

- On January 19, 2021, Johnson received a letter from Sufficiency Economy City Co.  It said, in relevant part,

   [W]e have faced some unexpected situations with our OEM product.  We realized that some of the OEM products did not reach the specifications required.  In addition, currently there is a lock down in some areas of Thailand due to the epidemic of COVID-19 which affects our production line. . . .  We therefore, would like to thank you for your trust and would like to assure you that we . . . will solve this gloves shortage situation . . . .  We will do our best to provide you the best products possible to fulfill your requirements.

   Doc. 53 at 10 (citing, in a roundabout way, Doc. 51 at 4–5 (Pretrial Order ¶ 2.a.16.)).

- On February 1, 2021, Johnson sent plaintiff a letter, dated January 31, 2021, on Sufficiency Economy City Co. letterhead.  This letter said,

   We, Sufficiency Economy City Co., Ltd. Would like to show our true intention of delivering every single product to our valuable customers.  Unfortunately, we have faced some unexpected situations.  In addition, there is a lock down in some areas of Thailand due to the epidemic of COVID-19 which affects our production line.  We therefore, would like to thank you for your trust and would like to assure you that that we, SKYMED, will solve this gloves shortage situation including the lack of medical supplies globally.  We will do our best to provide you the best products possible to fulfill your requirements.

   *Id.* (citing, in a roundabout way, Doc. 51 at 5–6 (Pretrial Order ¶ 2.a.19.)).

According to the summary judgment record, only the second notice made it to plaintiff.  So, plaintiff received notice of delays at SkyMed on February 1, 2021.  By this point, Bluestem already had missed the January 2021 Shipment Date from the SPA.  *See* Doc. 54-24 at 10 (SPA Schedule B); Doc. 51 at 2 (Pretrial Order ¶ 2.a.5) ("The delivery schedule attached to the SPA indicated that shipment date for the first shipment would be on a to-be-determined date in January 2021.").

Bluestem failed to comply with SPA § 8.1.  The first sentence of SPA § 8.1 required Bluestem to inform plaintiff "with a notice in writing to the buyer **prior to the delivery schedule**" if Bluestem couldn't deliver gloves for any reason.  Doc. 51 at 3 (Pretrial Order ¶ 2.a.7.) (emphasis added).  The second sentence required that Bluestem, if it had problems with manufacturers—which is exactly what happened—to "inform in writing the buyer with the approximated time period to deliver the product in a reasonable time."  *Id.*  The vague letter that Johnson forwarded to plaintiff does not provide an approximated time period.  So, neither of the notices that defendants cite comply with SPA § 8.1.

In sum, even if defendants had shown that COVID-19 and SkyMed's misconduct caused the non-performance within the reach of SPA § 7.2, defendants have failed to show that they properly notified plaintiff about the non-performance.[8]

### 2.  Impracticability

Defendants' summary judgment motion also invokes the affirmative defense of impracticability, codified in Kan. Stat. Ann. § 84-2-615.  But there's a twist:  in their Reply, defendants seem to argue that the court should *not* apply Kan. Stat. Ann. § 84-2-615.  *Compare*

---

[8]       A final note about SPA § 8.1:  Section 8.1 says that plaintiff can request a refund under certain conditions.  The parties devote much ink arguing about whether plaintiff has a right to a refund, but the court sees this controversy as irrelevant to summary judgment.  A Kansas breach of contract claim has five elements:  "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte*, 298 P.3d at 1098 (citations omitted).  Defendants, as movants for summary judgment, have not tied plaintiff's potential right to a refund to any of these elements.  Instead, defendants invoked § 8.1 in their motion because they anticipated that plaintiff would try to excuse its non-performance by claiming that § 8.1 allowed plaintiff to cancel the contract and demand a refund.  Doc. 53 at 14.  As explained above, the court concluded that defendants had neglected to establish that plaintiff failed to perform.  *See supra* § III.A.  And, tellingly, defendants did not assert this "no refund" theory as a defense to plaintiff's breach of contract claim in the pretrial order.  Doc. 51 at 20–21 (Pretrial Order ¶ 4.b.); *see also Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1267 (10th Cir. 2007) (explaining that the pretrial order controls the case after the pretrial conference).  The court thus declines to wade into the debate about a refund because it's not necessary to decide defendants' summary judgment motion.

Doc. 53 at 17–18 ("Alongside Section 7.2, K.S.A. § 84-2-615 excuses a seller from timely delivery of goods contracted for, where his performance has become commercially impracticable, so long as the seller notifies the buyer that there will be delay or non-delivery"), *with* Doc. 60 at 22 (arguing that the court should consider only SPA § 7.2 because the parties intended for SPA § 7.2 to supplant Kan. Stat. Ann. § 84-2-615).  Defendants' motion treats Kan. Stat. Ann. § 84-2-615 as an *independent* affirmative defense.  Doc. 53 at 17 ("*Alongside* Section 7.2, K.S.A. § 84-2-615 excuses a seller from timely delivery[.]" (emphasis added)).  But, in their Reply, defendants argue that the court should apply the out-of-party's-control test from SPA § 7.2 only.  Doc. 60 at 11.  Invoking freedom of contract, defendants' Reply argues that the court need not apply Kan. Stat. Ann. § 84-2-615 because the parties "var[ied] provisions of the U.C.C. by agreement."  *Id.*

Defendants raised this argument—that SPA § 7.2 supplants Kan. Stat. Ann. § 84-2-615—for the first time in their Reply.  The court need not "consider arguments raised for the first time in a reply brief."  *United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002).  "This is especially true when argument presented in a reply contradicts argument presented by the same party in an original motion."  *Mason v. Fantasy, LLC*, No. 13-cv-02020-RM-KLM, 2015 WL 429963, at *3 (D. Colo. Jan. 30, 2015).  But, as explained above, defendants' SPA § 7.2 argument failed.  So, taking extra care, the court considers whether Kan. Stat. Ann. § 84-2-615 excuses Bluestem's non-performance.

Kan. Stat. Ann. § 84-2-615 provides:

> Delay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made[.]

To take advantage of this impracticability defense, the statute requires that the "seller must notify the buyer seasonably that there will be delay or non-delivery[.]"  Kan. Stat. Ann. § 84-2-615(c).

"[I]mpracticability of performance may relieve a promisor of liability for breach of contract."  *Sunflower Elec. Coop., Inc. v. Tomlinson Oil Co.*, 638 P.2d 963, 969 (Kan. Ct. App. 1981).  Kansas law distinguishes between "subjective" and "objective" impracticability.  *Id.* at 970.  "This has been described as the difference, respectively, between 'I cannot do it' and 'the thing cannot be done.'"  *Id.*  "Only objective impracticability may serve to relieve a party of [its] contractual obligation."  *Id.*  Kansas law also provides three exceptions to the impracticability defense:

(1) **Fault**:  "the impracticability must not have been caused by the promisor[;]"

(2) **Foreseeability**:  "the promisor must have had no reason to know of the impracticability[;]"

(3) **Assumption of the risk**:  "the language or circumstances may indicate that the promisor not be relieved because of the impracticability[.]"

*Id.*  Defendants' Motion for Summary Judgment fails on each impracticability front:  notice, objective impracticability, and all three exceptions.

### a.  Notice

Start with notice.  Kan. Stat. Ann. § 84-2-615(c) required Bluestem to provide "seasonabl[e]" notice of "delay or non-delivery."  As explained above, plaintiff did not receive notice—the vague letters from SkyMed—about its January 2021 order until February 1, 2021.  *See supra* § III.B.1.b.  And so, the notice failed to comply with SPA § 8.1 because Bluestem did not provide plaintiff with notice in January 2021.  *See id.*  A reasonable factfinder could find this notice non-seasonable, precluding summary judgment for defendants under Kan. Stat. Ann. § 84-2-615.

### b. Objective Impracticability

Defendants also have failed to show objective impracticability—"the thing cannot be done"—as a matter of law.  Defendants argue that the COVID-19 resurgence in Thailand and SkyMed's refusal to refund and eventual theft of plaintiff's deposit money rendered Bluestem's performance impossible.  Doc. 53 at 17.  Plaintiff responds that "Bluestem has not established as an uncontroverted fact that the effects of COVID-19 in Thailand played any causal role in its failure to deliver gloves."  Doc. 54 at 20–21.  Plaintiff also argues that defendants both bear the fault for SkyMed's failure and assumed the risk of SkyMed's wrongdoing.  The court considers these arguments in the fault and assumption of the risk sections, *infra*.

 A court in this district, applying Kansas law, declined to find objective impracticability in similar circumstances.  *Mid-Am Bldg. Supply, Inc. v. Schmidt Builders Supply, Inc.*, No. 11-4167-KGS, 2013 WL 1308980 (D. Kan. Mar. 29, 2013).  There, defendant purchased building materials on credit from plaintiff.  *Id.* at *2.  Defendant's bank forced defendant to close and surrender all its assets to the bank.  *Id.*  The bank liquidated defendant's business, including the building materials that plaintiff had supplied to defendant on credit.  *Id.*  Naturally, defendant failed to pay plaintiff for the building materials.  *Id.*  When plaintiff brought a breach of contract action, defendant argued that the bank's forced closure qualified as objective impracticability. *Id.* at *5.  Our court rejected defendant's impracticability defense because defendant "fail[ed] to show why it was legally obligated to enter into the contract with the bank."  *Id.*  Defendant also "fail[e]d to show that paying [plaintiff] for the building materials was not possible[.]"  *Id.*

Similarly, defendants here haven't shown that Bluestem "was legally obligated to enter into the contract" with SkyMed.  *Id.*  The opposite is true:  nothing in the SPA required Bluestem

to use SkyMed as the manufacturer.  *See generally* Doc. 54-24 (SPA).  The court thus cannot find objective impracticability on summary judgment.

Defendants also have failed to show that Bluestem could not procure gloves elsewhere. Indeed, Bluestem employees considered using a different manufacturer, BestSafe, to complete plaintiff's order.  Doc. 54-1 at 117 (Johnson Dep. 391:14–22).  In December 2020, Bluestem sent plaintiff a shipping schedule that expected gloves from both SkyMed and BestSafe.  Doc. 51 at 4 (Pretrial Order ¶ 2.a.12.).  And Johnson sent plaintiff a photo of BestSafe gloves as "proof of life" of plaintiff's order.  Doc. 54-35 at 1, 3 (Ex. 34).  When plaintiff received its first shipment of gloves in May 2021, the gloves came from BestSafe.  Doc. 51 at 5 (Pretrial Order ¶ 2.a.23.). These references to another manufacturer support plaintiff's claim that Bluestem could have procured gloves from a manufacturer other than SkyMed.  So, defendants are not entitled to summary judgment because they have not shown objective impracticability as a matter of uncontroverted fact.

### c.  Fault

Plaintiff places the fault for its failed glove order squarely on Bluestem for picking SkyMed.  Plaintiff argues that the parties did not enter the SPA based on the assumption that Bluestem would rely on a single manufacturer—a manufacturer with whom Bluestem had never successfully completed an order—to fulfill the order by itself.  Doc. 54 at 22.  A reasonable factfinder could agree.  The SPA did not require Bluestem to use SkyMed and Bluestem never had fulfilled a complete nitrile glove order using SkyMed gloves.  Doc. 54-1 at 15 (Johnson Dep. 64:1–21).  The summary judgment record also shows that, in August 2021, Johnson wrote,

> Skymed never had any intention to make gloves . . . in fact he didn't have any
> production facilities of his own, and yet stated he did.  He has been using loads
> of other companies to make 'his brand' under false pretense . . . .  He has a
> dubious reputation among the manufacturing community[.]

Doc. 54-12 at 1 (Ex. 12).  It is not clear when Johnson learned this information, or if he should have learned it sooner.  But, construing the facts in the light most favorable to plaintiff, a reasonable factfinder could conclude that Bluestem's failure to deliver gloves was Bluestem's fault because it chose its manufacturer poorly.

### d.  Foreseeability and Assumption of the Risk

The court examines the last two impracticability exceptions together.  "When examining foreseeability and assumption of risk under the doctrine of impracticability, 'the language or circumstances of a contract may indicate that a party had assumed an obligation to perform despite impracticability.'"  *Mid-Am Bldg. Supply*, 2013 WL 1308980, at *5 (quoting *Sunflower Elec. Coop.*, 638 P.2d at 972).  And the court may not apply an impracticability defense "where the promisor, although having no power to prevent the contingency, had superior knowledge of the possibility of its happening."  *Id.* (citation and internal quotation marks omitted).

Plaintiff argues that Bluestem assumed the risk of SkyMed's alleged theft because, in SPA § 5.1, Bluestem promised that its subcontractors and suppliers would follow all applicable laws.  Plaintiff is correct.  SPA § 5.1 provides, "Each Party and its directors, officers, employees, subcontractors, sub-appliers, . . . and each Party's affiliates and their respective Representatives shall comply with all" applicable laws.  Doc. 54-24 at 4–5 (SPA § 5.1).  Bluestem promised that SkyMed—whether subcontractor, sub-applier, or affiliate—would follow the law and, in so promising, became responsible for SkyMed.

Plaintiff also argues that the parties knew COVID might disrupt the order.  Doc. 54 at 22.  Unfortunately for defendants, they agree.  In their motion, defendants write that the parties "were aware that the overseas PPE market was volatile and beset with uncertainties arising from the challenges of the Covid-19 pandemic[.]"  Doc. 53 at 16.  Defendants cite the force majeure

clause and its broad (but perhaps not broad enough) reach as evidence that the parties knew COVID could cause supply chain issues. *Id.* Because Bluestem had reason to know that COVID-19 could cause problems for plaintiff's glove order, defendants cannot use COVID-19 to excuse Bluestem's non-performance. *Sunflower Elec. Coop.*, 638 P.2d at 969 ("[T]he promisor must have had no reason to know of the impracticability[.]").

## IV.   Fraud Claim

Defendants also move for summary judgment against plaintiff's fraud claim, a claim plaintiff characterizes as fraudulent inducement.[9]  Under Kansas law, the elements of fraudulent inducement are:

> (1) [t]he defendant made false representations as a statement of existing and material fact; (2) the defendant knew the representations to be false or made them recklessly without knowledge concerning them; (3) the defendant made the representations intentionally for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations; (5) the other party sustained damages by relying upon the representations.

*Stechschulte*, 298 P.3d at 1096 (citations omitted).  Plaintiff argues that defendants made misleading statements, invoking Kansas law that "imposes a duty on defendants to correct any material misrepresentations[.]"  *N. Ala. Fabricating Co. v. Bedeschi Mid-West Conveyor Co.*,

---

[9]      As a threshold matter, defendants argue that Kansas law requires plaintiff to prove fraud by "clear and convincing evidence."  Doc. 53 at 18.  Defendants argue that, for "evidence to be sufficiently 'clear and convincing,' the witness to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue."  *Id.* at 18–19 (first citing *Mod. Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 596 P.2d 816 (Kan. 1979), then citing *Mackey v. Burke*, 751 F.2d 322, 328 (10th Cir. 1984)).  But defendants abandon this argument in their Reply—and for good reason.  *See generally* Doc. 60.  As plaintiff correctly pointed out, the Kansas Supreme Court has changed its formulation of the "clear and convincing" evidence standard.  *In re B.D.-Y*, 187 P.3d 594, 601 (Kan. 2008) (defining "clear and convincing evidence" as evidence establishing "that the truth of the facts asserted is 'highly probable'").  And "a party resisting a motion for summary judgment in an action based upon fraud need not present 'clear and convincing evidence' of fraud in opposing the motion."  *Hernandez v. Pistotnik*, 472 P.3d 110, 118 (Kan. Ct. App. 2020).

No. 16-2740-DDC-TJJ, 2018 WL 2198638, at *17 (D. Kan. May 14, 2018) (collecting Kansas

authorities).  As the Kansas Supreme Court has explained:

> Even though one is under no obligation to speak as to a matter, if he undertakes
> to do so, either voluntarily or in response to inquiries, he is bound not only to
> state truly what he tells, but also not to suppress or conceal and facts within his
> knowledge which will materially qualify those stated.  If he speaks at all, he
> must make a full and fair disclosure.  Therefore, if one wi[l]lfully conceals and
> suppresses such facts and thereby leads the other party to believe that the
> matters to which the statements made relate are different from what they
> actually are, he is guilty of a fraudulent concealment.

*Sparks v. Guar. State Bank*, 318 P.2d 1062, 1065 (Kan. 1957).  "To constitute actionable fraud

the representation must relate to past or present fact, as opposed to mere opinions or puffing or

promised actions in the future."  *Timi v. Prescott State Bank*, 553 P.2d 315, 325 (Kan. 1976)

(citation omitted).  The fact must qualify as material—"one to which a reasonable person would

attach importance in determining his choice of action in the transaction involved."  *Id.* (citation

omitted).  Critically, the "existence of fraud is normally a question of fact."  *Alires v. McGehee*,

85 P.3d 1191, 1195 (Kan. 2004) (citation and internal quotation marks omitted).

Defendants argue that plaintiff's fraud claim fails as a matter of law for three reasons:

- Plaintiff cannot prove that Bluestem's statements were false,

- the statements plaintiff complains of are corporate optimism or puffery and therefore
  cannot serve as the basis for a fraud claim, and

- the statements were not material.

Doc. 53 at 18–26.

Plaintiff takes issue with "Johnson's statements about the extent and nature of Bluestem's

relationships with glove factories, the extent of its worldwide presence, and the extent to which it

was fulfilling other large orders for nitrile gloves[.]"  Doc. 54 at 35.  According to plaintiff, these

statements "were all misleadingly incomplete." *Id.*  Here, fact issues preclude the court from granting summary judgment.  The two fact issues discussed below provide useful examples.

*First*, a dispute of material facts exists about defendants' statements about manufacturer connections.  On June 12, 2020, Johnson told plaintiff in an email, "We have 26 facilities producing for us in SE Asia, strategically."  Doc. 54-4 at 3 (Pl.'s Ex. 4).  When asked about the email at his deposition, Johnson testified:

> Q:  Did you ever tell [plaintiff] that you weren't talking about 26 facilities that produce nitrile gloves?
>
> A:  We had found more than 20 or 16, we found more than that.  Yes this is –
>
> Q:  That's not my question.
>
> A:  This could have been very easily just on nitrile gloves.  It changed – the volatility of that changed every single day –
>
> Q:  You wrote –
>
> A:  – so, on this particular day at that particular time we had at least 26 facilities producing nitrile gloves among lots of other things, including latex, including vinyl, including all sorts of other product.  **So, at that particular time that was probably referring to 26 factories producing nitrile gloves.**
>
> Q:  When you say producing for us –
>
> A:  Yes.
>
> Q:  – had they produced any gloves – had each of those 26 factories produced gloves for Bluestem Management Advisors?
>
> A:  No, that's not what it says.
>
> Q:  It says producing.
>
> A:  They are producing, right.
>
> Q:  Were they producing for you, for Bluestem Management Advisors, gloves? Had they done that?
>
> A:  Some of them were, yes, and more.

> **Q:   Were all 26 in the process of producing nitrile gloves for Bluestem Management Advisors?**
>
> **A:  No.**

Doc. 54-1 at 60–61 (Johnson Dep. 124:2–125:7) (emphases added).  With this contradictory testimony, plaintiff has adduced evidence from which a reasonable factfinder could determine or infer that Johnson made a false representation when he wrote, "We have 26 facilities producing for us in SE Asia[.]"  Doc. 54-4 at 3 (Pl.'s Ex. 4).  Nor is that statement mere puffery—"the representation . . . relate[s] to past or present fact[.]"  *Timi*, 553 P.2d at 325 (1976).  And a reasonable factfinder could find this statement material because a reasonable person could consider Bluestem's factory relationships material to the decision.  So, the court cannot conclude that Bluestem's statements about the number of facilities and its production capacity are not fraudulent as a matter of law.

  *Second*, a reasonable factfinder also could conclude that defendants made false statements about Bluestem's relationships with manufacturers or had a duty to disclose more about Bluestem's relationship with the manufacturers.  In a June 16, 2020, email, Johnson mentioned "our 16 factory consortium of secured production[.]"  Doc. 54-4 at 4 (Pl.'s Ex. 4).  On July 30, 2020, Johnson told plaintiff, "We have 21 factories in our glove consortium with the balance of below market pricing[.]"  Doc. 54-10 at 1 (Pl.'s Ex. 10).

  Plaintiff's fraud claim survives summary judgment if these statements have no reasonable basis in fact.  *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991) ("[C]onclusory terms in a commercial context are reasonably understood to rest on a factual basis that justified them as accurate, the absence of which renders them misleading[.]").  Indeed, these statements lack a factual basis in the summary judgment record.  When presented with a list of the alleged

sixteen factories in the consortium, Doc. 54-18 at 38 (Pl.'s Ex. 18), Johnson testified that Bluestem successfully had acquired gloves from only two of the factories on the list, Doc. 54-1 at 88–92 (Johnson Dep. 291:19–295:15).  A reasonable factfinder could conclude or infer that "consortium" implies a joint venture or other form of relationship and, as a result, defendants misled plaintiff.

The court cannot conclude, as a matter of law, that defendants misrepresented no material facts.  And, of course, the court must heed the Kansas Supreme Court's directive that the "existence of fraud is normally a question of fact."  *Alires v. McGehee*, 85 P.3d 1191, 1195 (Kan. 2004) (citation and internal quotation marks omitted).  The court denies defendants' summary judgment motion against plaintiff's fraud claim.

## V.     Conclusion

For the reasons stated in this Memorandum and Order, the court denies defendants' Motion for Summary Judgment (Doc. 52).[10]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 52) is denied.

**IT IS SO ORDERED.**

**Dated this 2nd day of August, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

[10]     The court declines plaintiff's invitation to enter summary judgment in its favor, sua sponte.  The court agrees with defendants—if plaintiff wanted summary judgment, plaintiff should have moved for summary judgment.